UNITED STATES, Appellee

v.

CLARK R. JESTER, Private E–1, U. S. Army, Appellant

4 USCMA 660, 16 CMR 234

No. 1655

Decided August 20, 1954

MAJ Edwin Doran, U. S. Army, and 1ST LT Jack J. Albert, U. S. Army, for Appellant.
LT COL William R. Ward, U. S. Army, 1ST LT Roderick V. Brown, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

### Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Jester, was originally tried on June 19, 1952, by a general court-martial, convened in Korea, under two specifications alleging willful disobedience of the order of a superior noncommissioned officer, in violation of the Uniform Code of Military Justice, Article 91, 50 USC § 685. One specification alleged that, on May 21, 1952, he had willfully disobeyed a lawful order from Master Sergeant Carl B. Abel "to get into a jeep and proceed to the 17th Infantry Regiment Command Post"; the second that, on May 17, 1952, he had willfully disobeyed a further lawful order from the same Master Sergeant "to go back to work and finish digging a hole for a latrine." The findings of guilty rendered by the

**661**

court-martial were ultimately reversed in this Court and a rehearing ordered. See United States v. Jester, 2 USCMA 280, 8 CMR 80. The accused's present petition for review—following conviction at a second trial—was granted to permit consideration of claimed error in receiving certain former testimony given at the first court-martial hearing.

II

The former testimony offered by the Government—its only evidence, in fact —was that of Master Sergeant Abel and Sergeant First Class Gibson, the sole prosecution witnesses at the original trial. In seeking to establish the admissibility of this former testimony, the Government relied exclusively on a presumption to the effect that, since the two witnesses had been present in Korea in June 1952—the time of the original trial—they were there on May 7, 1953, the date of the rehearing. If this presumption be accepted, then it would appear that the witnesses in question were "more than 100 miles from the place where the trial is held"—Camp Roberts, California—with the result that their testimony was admissible. See Manual for Courts-Martial, United States, 1951, paragraph 145b.

The defense objected to the sufficiency of the foundation for admissibility. The accused took the stand in this connection to testify that, at the time of the first trial, Sergeant Abel had stated that he was being retained in Korea for use as a witness at the court-martial hearing; otherwise he would have been in process of departure for the United States on rotation. The accused also asserted that "the usual length of time over there" was "about nine months."

III

In general, we are inclined to accept the principle that, if a certain residence is established with respect to a witness as of a time prior to trial, it will be presumed—in the absence of proof to the contrary—that his residence is unchanged at the time of the hearing. Manual, supra, paragraph 138a. United States v. Nelson [CM 347000 (reh)],

**662**

3 CMR 165. This presumption—one on which the admissibility of depositions and former testimony is often predicated—rests on both logical inference and procedural convenience. However, the logical basis for the inference is simply nonexistent in the present setting.

It is a matter of common knowledge —and a fact we may notice judicially— that the United States Army maintained a large-scale program of rotation in the case of personnel serving in Korea, which in the main was efficiently operated. In connection with this schedule, the accused testified that the usual tour of duty there was less than one year—and thereby assailed the presumption that either Sergeant Abel or Sergeant Gibson was in the Far East at the time of the rehearing. Of course, we know judicially that the average tour of duty in Korea varied at different periods during the hostilities there. Moreover, it fluctuated with the type and location of the service performed— since, under Army directives, the allocation of "rotation points," on which return to the United States depended, was based on whether the soldier concerned was in combat or in a reserve position. See United States Armed Forces, Far East, Circular No. 35, February 19, 1953; Circular No. 184, December 28, 1953. Yet the record of the first trial reveals indisputably that Sergeant Abel, whose two orders the accused was alleged to have disobeyed, was stationed in Korea on May 17, 1952—only ten days short of a year before the retrial. Further, there are definite indications in that record that both Sergeant Abel and Sergeant Gibson had served in Korea for a considerable period prior to May 1952.

The practical unlikelihood, in light of the rotation program, that the two absent witnesses had remained indefinitely there renders it impossible for us to accept the presumption of continued residence insofar as the case at bar is concerned. With respect to the considerations of procedural convenience said to underlie the presumption, we may observe that the

burden of determining where these witnesses were stationed in May 1953—if they had remained in the Army—or their last known addresses—if they had become civilians—would seem a light and insubstantial one to place on the shoulders of the Government. And it was the Government, of course, which sought to introduce their previous testimony under an apparent exception to the hearsay rule. This onus, as a practical matter, could doubtless have been satisfied fully through a routine inquiry made of The Adjutant General's office.

Trial counsel have objected to the accused's testimony on the subject of Sergeant Abel's remark concerning his prospective return to the United States. Insofar as this testimony indicated an intention on the Sergeant's part to leave Korea, we must consider the testimony admissible—at least under Federal precedents. Mutual Life Ins. Co. v. Hillmon, 145 US 285, 36 L ed 707, 12 S Ct 909. The evidence of Abel's *state of mind*—as revealed by his utterances—would demonstrate that he wished to return to the United States as quickly as possible, and would not, therefore, request an extension of his tour of duty in Korea, even though his objective in this regard would necessarily be conditioned by the orders of military superiors.

It will be remembered, too, that—apart from his testimonial assertion regarding Abel's intention—the accused stated that "the usual length of time over there" [service in Korea] is "about nine months." While facts of which we may take judicial notice suggest that the "usual" tour of duty in Korea was somewhat longer than that indicated by the accused, they do not indicate that such a tour would be so protracted as to render it likely that the witnesses were stationed in Korea at the time of the rehearing. Nor did the Government come forward with any sort of proof that they might have fallen within some special category of personnel subject to unusually long retention in the Far East.

In our view, the Government had not caused it to appear that either Sergeant Abel or Sergeant Gibson was located in Korea at the date of the rehearing.

If not in Korea, they may have been situated at *any* point at that time—even at locales within one hundred miles of Camp Roberts. The fact that they had been in Korea in June 1952 would then become immaterial, and the result would be the same as if the Government had offered no foundation whatever for the introduction of their former testimony. Accordingly, this testimony was inadmissible, for the reason that the Government had laid no predicate for its reception, as required by the Code and the Manual.

## IV

Having concluded that error was committed in admitting the former testimony of the two sergeants, it remains to evaluate the probable effect of that infirmity on the present conviction. The view has been advanced by the Government that the accused can have been in no way prejudiced by reason of the challenged testimony for the reason that at the rehearing he judicially confessed to guilt of both offenses. Certainly he did admit having received the two orders from Sergeant Abel; that he verbally refused to carry them out; and that he did not in fact obey them. The defense, on the other hand, contends that, while the accused conceded that he had not complied with the Sergeant's directions, at the same time he asserted that, when they were given, Abel had been drinking—as disclosed by the odor of his breath. Therefore—the accused argued—he could not know at the time whether the Sergeant "actually meant" what he said. Thus—it is urged—the former in fact disputed, rather than granted, the willfulness of his conduct and possibly even the lawfulness of the orders.

We distinctly prefer the Government's stand on this question. The difficulty with the defense position is simply that it is not borne out by the facts. We can find no shred of evidence suggesting that, when he gave the orders in question, the Sergeant was an irresponsibly intoxicated man—or even that, reasonably or no, the accused believed him to be. As we read the record, all we find the latter to have said on the stand

was that Abel "had been drinking because you could smell it on his breath" —and there was no other evidence touching alcohol. Assuming that Abel did reek of liquor, this can have had no effect—in the present setting—on the character of the accused's refusal to comply. Regardless of the circumstances under which the two orders were given—and they were widely separated in time—it nowhere appears that Jester's verbal rejection and subsequent disobedience were other than vehement, intentional, purposeful and willful. Indeed, from his own testimony it appears that they were all of these things.

Much the same reasoning applies to the possibility that the orders were unlawful. It certainly does not follow that they were so merely because Sergeant Abel "had been drinking"—if, in fact, he had been—and the record contains no other evidence bearing on illegality. On the contrary, defense counsel not only conceded the lawfulness of the orders at the trial, but in his closing argument urged—erroneously, we believe—that in truth they proceeded from higher authority, rather than from Sergeant Abel.

### V

Thus, we conclude that, although error resulted from the admission of the former testimony here, the accused was not prejudiced thereby. Accordingly, the decision of the board of review is affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with the majority that the former testimony was improperly admitted in evidence. However, unlike them, I believe that the accused was prejudiced by the error.

The majority find a complete admission of guilt in the accused's testimony. I do not. As I read his testimony, the accused clearly denied, at least, the element of willfulness. He testified that Sergeant Abel was under the influence of alcohol when he gave the orders alleged. On cross-examination as to whether he thought it was right to obey the order of a noncommissioned officer, the accused said, "Well sir, if a man is under the influence of alcohol, you don't know whether he means the things he says or not." However, even assuming a full confession of guilt, the admission of the former testimony materially prejudiced the accused in respect to the sentence.

In United States v. Bounds, 1 USCMA 224, 229, 2 CMR 130, the accused entered a formal plea of guilty to a charge of wrongful appropriation. Nevertheless, we sustained reversal of the accused's conviction on the ground that a fair risk of prejudice was present, in the court's deliberations on the sentence, because one of the members of the court "may have become aware of facts, not admissible in evidence, and possibly aggravating in character." Here, the former testimony shows aggravating circumstances which are in direct conflict with the extenuating matters presented by the accused. The inevitable result of a comparison of the two would be the imposition of a more severe sentence. I have no doubt that the court made the comparison in its deliberations on the sentence.

Accordingly, I would set aside the findings of guilty and order a rehearing.